IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RYAN KERWIN, ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 05-93 Erie |
| LT. WILLIAM MCCONELL, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

MCLAUGHLIN, SEAN J., District Judge

Plaintiff, Ryan Kerwin, a former inmate at SCI Albion, originally filed this action pursuant to 42 U.S.C. § 1983 against Defendant, Lt. William McConnell, alleging that McConnell violated his First Amendment rights when he issued him a misconduct in retaliation for having filed a lawsuit and/or an administrative grievance. See Complaint [Doc. No. 3]. Following a three-day jury trial conducted on November 26, 2007 through November 28, 2007, the jury found in favor of Plaintiff and awarded him $5,000.00 in compensatory damages and $100,000.00 in punitive damages. See Special Interrogatories [Doc. No. 118]. Currently pending before the Court is Defendant's Motion to Amend or Alter Judgement and Motion for New Trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

### I. BACKGROUND[1]

The evidence at trial consisted of the following: Prior to Plaintiff's transfer to SCI Albion, he was an inmate at SCI Smithfield and was in the process of filing a lawsuit against officials at that institution regarding assaults that allegedly took place there. See Trial Tr. Day 2 pp. 47-48. Plaintiff claimed that during his transfer from SCI Smithfield to SCI Albion on July

---

[1]We summarize the evidence presented at trial in the light most favorable to Plaintiff, the the verdict winner. See Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691-92 (3rd Cir. 1993) (as amended on petition for rehearing).

1

14, 2003, certain unidentified Albion correctional officers were abusive to him. Trial Tr. Day 2, pp. 37-38; Plaintiff's Ex. 1. For example, he indicated that during a strip search, one officer asked him to repeatedly lift his testicles and penis and to spread his buttocks. See Trial Tr. Day 2 p. 37. When he protested these actions, Plaintiff claimed that he was threatened with a misconduct. Trial Tr. Day 2 p. 37. Plaintiff also claimed that before he could respond with his inmate number, he was informed by an officer not to "worry about it" because "we already know your number." Trial Tr. Day 2 p. 38.

Upon his arrival at Albion, Plaintiff testified that the abuse "didn't stop." Trial Tr. Day 2 p. 39. According to Plaintiff, he was assigned to pick up trash and mow the yard while other inmates were allowed out into the yard, and on one occasion he was pulled out of the "chow hall" and threatened with a misconduct. Trial Tr. Day 2 p. 39. Plaintiff relayed a conversation wherein Roderick Showers allegedly informed him that "he already heard about the lawsuit" and had better reconsider filing or he would regret it. Trial Tr. Day 2 pp. 40; 85-86. He also allegedly told him "his officers [had] no problem dealing with troublemakers." Plaintiff's Ex. 29.

Plaintiff filed a grievance on July 23, 2003 recounting the preceding events. Trial Tr. Day 2 pp. 39-40; Plaintiff's Ex. 1. This grievance was assigned to McConnell for investigation. Trial Tr. Day 1, p.174-175; Plaintiff's Ex. 29. At the time of trial, McConnell had been employed by the Department of Corrections for approximately 16 years holding several different positions, and at the time of his investigation of Plaintiff's grievance, he was a lieutenant assigned to the security department. Trial Tr. Day 1 p. 174; Trial Tr. Day 2 pp. 9-10.

McConnell interviewed Plaintiff on August 6, 2003. Trial Tr. Day 1 p. 179. McConnell claimed that Plaintiff's responses to his questions lacked detail and that Plaintiff could not remember specific profanities directed at him. Trial Tr. Day 1, pp. 108-109; 185-186. McConnell also interviewed inmate William Clark who, according to McConnell, did not support Plaintiff's allegations. Trial Tr. Day 1 p. 188. He claimed that Clark informed him that

2

he did not witness any harassment during transport to SCI Albion or any verbal harassment of Plaintiff thereafter. Trial Tr. Day 1 pp. 187-188. On cross examination, McConnell was presented with Clark's affidavit wherein he claimed to have informed McConnell of the harassment of Plaintiff which occurred on the bus and thereafter. Trial Tr. Day 1 pp. 188-189.[2]

---

[2]Mr. Clark's declaration stated the following:

> While detained in the holding cells of S.C.I. Smithfield awaiting transfer to S.C.I. Albion, I met an inmate named Brian Kerwin. During a strip search, prior to transfer, I observed an Albion officer (who was strip searching inmate Kerwin) harass Kerwin for no apparent reason during the search.
>
> This officer seemed to find humor in ordering Kerwin to lift his genitals and spread his buttocks "wider" numerous times. The officer even ordered Kerwin to allow him to look into his nose.
>
> When Kerwin would try to protest this abuse, the officer would yell at him and threaten him with a misconduct for refusing to obey an order. The officer even cursed at him and at one point said "Get used to this type of treatment because there would be more of it after you get to Albion".
>
> After the strip search, myself, inmate Kerwin, and several other inmates were placed in another cell to await transfer. At that time correctional officers were calling the names of inmates who were ordered to leave the cell and state their prison identification number as they were leaving. When the officer called Kerwin's name, he was told "Don't say anything, I already know your number", in a very sarcastic manner.
>
> I was subsequently placed on a bus with Kerwin and several other inmates and later arrived at S.C.I. Houtzdale. After the inmates who were to be housed there exited the bus, I heard a bus officer ask Kerwin if he was headed for Albion. When he stated yes, the bus officers began to mumble with each other and then laugh out loud.
>
> The morning of my first full day at Albion, I was called down to see the psychiatrist at the education building along with

McConnell nevertheless denied that the affidavit was substantively accurate. Trial Tr. Day 1 pp. 188-191.

McConnell also interviewed another inmate, Valentine, who was on the transport bus with Plaintiff. Trial Tr. Day 1 pp. 104; 116-117. McConnell claimed that this witness failed to support Plaintiff's allegations. Trial Tr. Day 1 pp. 104; 116-117. In addition, McConnell interviewed the officers assigned to the bus, Spurlock, Sabol and Rhoades. Trial Tr. Day 1 pp. 93-94; 103-104. Officer Spurlock confirmed that he did perform a strip search of Plaintiff but denied that he repeatedly directed Plaintiff to lift his testicles and penis and spread his buttocks. Trial Tr. Day 1 pp. 199-200. McConnell explained that Spurlock informed him that he asked Plaintiff to perform this action only twice because he had done it too quickly the first time. Trial Tr. Day 1 p. 200. According to McConnell, Spurlock also denied that he had directed any profanity towards Plaintiff or threatened him in any way. Trial Tr. Day 1 p. 200. McConnell interviewed Showers on August 13, 2003 and claimed that Showers denied making the threatening statements attributed to him by Plaintiff. Trial Tr. Day 1 pp. 197-198.

In addition to the above described interviews, McConnell also reviewed Plaintiff's cumulative adjustment record ("CAR"), which is a day-to-day diary of an inmate's overall adjustment. Trial Tr. Day 1 pp. 134; 198-199; Plaintiff's Ex. 29. The CAR contained two entries on July 23, 2003. Trial Tr. Day 1 p. 135; Plaintiff's Ex. 15. The first entry was recorded

---

> Mr. Kerwin. When we approached the building door, Kerwin was stopped by two officers who told him "they heard all about him", and that he "looked like a trouble maker". I also heard them tell him "he would be picking up trash by the end of the week".
>
> I was subsequently interviewed by Lt. McConnell regarding the forementioned incidents and I told him[] exactly what I have testified to in this affidavit.
>
> I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Plaintiff's Ex. 5.

4

by Officer Griener, and reflected that when given a direct order not to get up and roam around the dining hall, Plaintiff was disrespectful and mouthy. Trial Tr. Day 1 p. 135; Plaintiff's Ex. 15. The second entry was by Officer Wernicki, and stated that Plaintiff had a poor attitude, problems following orders and was very smug and disrespectful towards staff. Trial Tr. Day 1 p. 135; Plaintiff's Ex. 15.

McConnell claimed that as a result of his investigation, he concluded that Plaintiff had fabricated the allegations of harassment by staff and consequently, issued him a misconduct on August 26, 2003 for lying concerning the alleged conduct. Trial Tr. Day 1 p. 203; Plaintiff's Ex. 2. McConnell's findings were included in a summary report to which he appended a copy of Plaintiff's CAR. Trial Tr. Day 1 p. 230; Plaintiff's Ex. 2; Plaintiff's Ex. 15.

Plaintiff testified that this misconduct was issued "the very next day" after he had received notice on August 25, 2003 from the Huntingdon County Courthouse granting him *in forma pauperis* status on his lawsuit against Smithfield. Trial Tr. Day 2 p. 41; Plaintiff's Exs. 3 and 4. There was no dispute that McConnell was aware of Plaintiff's lawsuit against Smithfield at the time he issued the misconduct. Trial Tr. Day 1 pp. 173-174.

Plaintiff was subsequently found guilty of the misconduct following an administrative hearing and a 30-day cell restriction was imposed as punishment. Trial Tr. Day 1 p. 204; Trial Tr. Day 2 p. 42. Inmates confined to their cells are allowed out only for specific purposes. Trial Tr. Day 1 p. 205. They are permitted access to the law library, are able to attend meals three times a day, may go to the medication line and are allowed one hour of recreation a day. Trial Tr. Day 1 p. 205. Other than the 30-day cell restriction, Plaintiff testified to no other adverse consequences resulting from McConnell's issuance of the misconduct. Trial Tr. Day 2 p. 42-43.

Clark's testimony at trial contradicted that of McConnell's. He claimed that the information in his affidavit was accurate concerning the harassment of Plaintiff and that he had informed McConnell of same. Trial Tr. Day 2 pp. 26-31.

At the conclusion of the trial, the jury found in favor of Plaintiff on his First Amendment

5

retaliation claims and awarded him $5,000.00 in compensatory damages to compensate Plaintiff for his emotional distress and $100,000.00 in punitive damages. See Special Interrogatories [Doc. No. 118]. McConnell subsequently filed a Motion to Alter or Amend Judgment and Motion for New Trial with a Brief in Support on December 7, 2007 [Doc. Nos. 121 and 122]. Plaintiff filed a Brief in Opposition on January 9, 2008 [Doc. No. 123]. This matter is now ripe for our review.

## II. STANDARD OF REVIEW

A motion to alter or amend judgment is governed by Rule 59(e) of the Federal Rules of Civil Procedure which allows a party to move to alter or amend a judgment within ten days of its entry. Fed.R.Civ.P. 59(e). It is a device of limited utility in that its purpose is to correct manifest errors of law or fact or to present newly discovered evidence. Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3rd Cir. 1985). In order to prevail, a party must demonstrate, *inter alia*, the need to correct a clear error of law or fact or to prevent manifest injustice. Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3rd Cir. 1999).

Federal Rule of Civil Procedure 59(a) governs a motion for new trial. According to Rule 59(a), a court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). This relief may be sought on the grounds "that the verdict is against the weight of the evidence, that damages are excessive," that the Court committed substantial errors of law in the admission or rejection of evidence or instructions to the jury, or that the trial was otherwise not fair to the moving party. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). The decision of whether or not to grant a new trial "is committed to the sound discretion of the district court." Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 812 (3d Cir. 1984), cert. denied, 477 U.S. 908 (1986); see also Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980); Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995). The district court's latitude varies, however, depending on the type of error alleged. Klein v. Hollings, 992 F.2d

6

1285, 1289-90 (3d Cir. 1993). The court's latitude "is broad when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court." Id. In this regard, however, even if the court determines that an error was made on the law, it should only grant a new trial when the movant was prejudiced by the error. See Hulmes v. Honda Motor Co., Ltd., 960 F. Supp. 844, 849 (D. N.J. 1997).

### III. DISCUSSION

*A.     Damages*

*1.     Compensatory damages*

Defendant first argues that the Court should reduce the award of compensatory damages from $5,000.00 to $1.00 in nominal damages because Plaintiff failed to establish physical injury as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e). See Defendant's Brief in Support pp. 1-2 [Doc. No. 122]. Section 1997e(e) provides:

> (e) Limitation on recovery
>
> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). In Allah v. Al-Hafeez, 226 F.3d 247, 249-51 (3rd Cir. 2000), the Third Circuit held that § 1997e(e) bars claims for damages for mental or emotional injury absent physical injury. See also Mitchell v. Horn, 318 F.3d 523, 535 (3rd Cir. 2003). Section 1997e(e) does not, however, bar prisoners from seeking nominal damages or punitive damages to vindicate constitutional rights. Allah, 226 F.3d at 251; Devon v. Warden SCI-Mahony, 2008 WL 3890161 at *3 M.D.Pa. 2008) (inmate alleging a violation of his constitutional rights may still pursue an action to recover nominal and/or punitive damages even in the absence of compensable harm).

Plaintiff argues that McConnell has waived any challenge to the compensatory damage award by failing to object in a timely manner to the Court's Jury Instructions and the Special Interrogatory form. Rule 51 of the Federal Rules of Civil Procedure provides that no party may assign as error the giving or the failure to give an instruction unless that party properly objected

7

at the time of trial. Fed.R.Civ.P. 51(b) and (d). Here, the parties were provided a copy of the Jury Instructions, as well as the Special Interrogatory form, prior to the Court's charge to the jury. The jury was instructed that compensatory damages included "compensation for any physical or emotional pain, suffering, inconvenience, mental anguish, and loss of the enjoyment of life that the Plaintiff suffered as a result of the Defendant's violation of his Constitutional rights." See Final Instructions to the Jury p. 10 [Doc. No. 115]. However, the jury was not informed that damages for emotional pain and suffering could not be awarded in the absence of physical injury.[3] The Court also submitted to the jury Special Interrogatories wherein the jury was asked to determine at Special Interrogatory No. 5 the amount of compensatory damages for "[e]motional distress." See Special Interrogatories [Doc. No. 118] Question No. 5. McConnell did not, however, object to the Jury Instructions with respect to damages or object to Special Interrogatory No. 5. See Trial Tr. Day 2 pp. 101-122.

Ordinarily, under such circumstances, we would review McConnell's challenge for plain error in the absence of a properly preserved objection at the time of trial. See Fed.R.Civ.P. 51(d)(2); Fashauer v. New Jersey Transit Rail Operations, 57 F.3d 1269, 1289 (3rd Cir. 1995) (holding plain error is standard of review in the absence of a party's preservation of an assigned error). In this case however, not only did McConnell fail to object to the Jury Instruction on damages, but he submitted his own proposed Jury Instruction on damages which did not delineate the need for physical injury as a precondition to the recovery of compensatory damages for emotional distress. See Defendant's Proposed Jury Instructions [Doc. No. 110]. In addition, he submitted a proposed verdict slip similar to that ultimately submitted to the jury which did not require the jury to find physical injury as a precondition to damages for "emotional pain and anguish." See Defendant's Proposed Verdict Slip [Doc. No. 109] Question No. 4.

As we observed in Brown v. Cost Co., 2006 WL 544296 (W.D.Pa. 2006):

---

[3] It was undisputed that Plaintiff did not suffer any physical injury as a result of his 30-day cell restriction.

> ... Where the alleged error is invited by a party through her counsel, even "plain error" will be deemed waived. *See 2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,* 369 F.3d 732, 744 (3rd cir. 2004) (failure to object to erroneous instruction tantamount to invited error); *United States v. Stewart,* 185 F.3d 112, 127 (3rd Cir. 1999), *cert. denied*, 528 U.S. 1063, 120 S.Ct. 618, 145 L.Ed.2d 512 (1999) (court will only reverse under plain error doctrine where party did not invite error); *United States v. West Indies Transport, Inc.*,127 F.3d 299, 306 (3rd cir. 1997) (error in challenged jury instruction was invited where party's proposed instruction was remarkably similar to that actually given); *Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 772 (3rd Cir. 1975) (where trial court followed party's proposal, any error at all was invited error); *Maloney v. Tunnell,* 218 F.2d 705, 707 (3rd Cir. 1955) (plaintiff may not claim as error the giving of an instruction which he in substance requested); *Drames v. Sun River Investment, S.A.,* 820 F. Supp. 209, 215-16 (E.D.Pa. 1993) (no error is present where the instructions to which the moving party objects are practically identical to the proposed jury instructions submitted by movant); *aff'd*, 17 F.3d 1429 (3rd Cir. 1994) (Table case); *Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc.*, 647 F. Supp. 216, 230 (E.D.Pa. 1986) (plaintiff cannot complain to court's instructions when court adopted their own proposals). ...

Brown, 2006 WL 544296 at *2. Here, we find any error, plain or otherwise, was waived by McConnell's counsel under the invited error doctrine. McConnell's request to alter or amend the compensatory award of $5,000.00 is denied.

### 2. *Punitive damages*

McConnell next challenges the punitive damages award as excessive. In contrast to compensatory damages, which "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," see Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001), "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and deter others from similar behavior." Memphis Cmty. School Dist. v. Stachura, 477 U.S. 299, 306 n.9 (1986). The United States Constitution prevents "grossly excessive" punitive damage awards because such awards "further[] no legitimate purpose and constitutes an arbitrary deprivation of property." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003).

In determining if a punitive damages award is reasonable, the court must consider three

9

"guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Id. at 418 (citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 574-75 (1996)). If a court determines that a jury's punitive damages award is unconstitutionally excessive, the court should decrease the award to an amount the evidence will bear. Willow Inn, Inc. v. Public Service Mutual Ins. Co., 399 F.3d 224, 231 (3rd Cir. 2005) (citing Dunn v. HOVIC, 1 F.3d 1371, 1381 (3rd Cir. 1993) (*en banc*)). With these considerations in mind, we address each of the Supreme Court's three guideposts in turn.

### a. *Degree of reprehensibility*

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." State Farm, 538 U.S. at 419; Gore, 517 U.S. at 575; Willow Inn, 399 F.3d at 230. "This principle reflects the accepted view that some wrongs are more blameworthy than others." Gore, 517 U.S. at 575; Willow Inn, 399 F.3d at 230. For example, "nonviolent crimes are less serious than crimes marked by violence or the threat of violence" and "trickery and deceit are more reprehensible than negligence." Gore, 517 U.S. at 575-76. In evaluating the reprehensibility of a defendant's conduct, the Supreme Court has instructed that a court should look to whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm, 538 U.S. at 419. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." Id.

We first observe, as previously discussed, that Plaintiff sustained no physical injury, or for that matter, economic loss as a result of his 30-day cell restriction. Unlike an inmate who is

10

in restrictive housing, Plaintiff was able to maintain his personal property and was permitted a certain amount of freedom of movement. In addition, there was no evidence presented that McConnell engaged in repeated instances of retaliation. This case involved only one instance of retaliation by issuing the misconduct.

McConnell suggests that this case does not involve conduct that poses a threat to the health or safety of others. While not perhaps in as direct a sense as in other cases, this prong is at least tangentially implicated here. Retaliation against prisoners for voicing complaints for staff harassment or abuse sends a message to the perpetrators that they have a "green light" to the potential detriment of the prison population. The conduct here, of course, would be considered unlawful in all states and we note that the jury found by a preponderance of the evidence that McConnell had acted "maliciously or wantonly" in violating Plaintiff's constitutional rights. See Special Interrogatories [Doc. No. 118] Question 6.

Having carefully reviewed the reprehensibility factors in the context of this case, we find that the punitive damages award of $100,000.00 is excessive and a substantially more modest award would adequately serve the objective of deterrence and punishment.

### b. *Ratio of punitive damages to harm*

The second prong of the punitive damages test considers the difference between the punitive damages and the actual or potential harm suffered by the plaintiff. State Farm, 538 U.S. at 418. Courts must "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id. at 426; Gore, 517 U.S. at 580 ("The principle that exemplary damages must bear a "reasonable relationship" to compensatory damages has a long pedigree."). The constitutionally acceptable range is not reducible to a simple mathematical formula and the Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio." State Farm, 538 U.S. at 424; Willow Inn, 399 F.3d at 233. In practice, the Supreme Court has made clear that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will

satisfy due process." State Farm, 538 U.S. at 425. As observed by the Third Circuit: "[t]he Supreme Court's ratio discussions evidence a concern that the punishment should fit the crime, and imply the general observation that conduct that visits great economic harm onto a plaintiff is likely to be more culpable than where the stakes are lower." Willow Inn, 399 F.3d at 234.

Here, the punitive damages award bears a 20:1 ratio to the amount of compensatory damages awarded by the jury. McConnell argues that such an award "raises a cautionary flag" since it exceeds the single digit ratio between punitive and compensatory damages and far exceeds the four-to-one ratio that the Supreme Court has suggested might be close to the line of constitutional impropriety. See Defendant's Brief p. 6; Jones v. Sheahan, 2003 WL 22508171 at *16 (N.D.Ill. 2003) (quoting State Farm, 538 U.S. at 425).

We are mindful that the Supreme Court has recognized that greater ratios may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages, see State Farm, 538 U.S. at 425; Gore, 517 U.S. at 582; Peake v. Patterson, 2007 WL 2903209 at *5 (M.D.Pa. 2007) ("In civil rights cases, in particular, larger multipliers may pass constitutional muster."), or where a violation of a constitutional right is concerned. See Romanski v. Detroit Entertainment, LLC, 428 F.3d 629, 645 (5th Cir. 2005). That said, the ratio of the punitive damages award to the compensatory award entered by the jury is quite high.

### c. *Comparable cases*

The third and final guidepost to be examined is "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." State Farm, 538 U.S. at 428. "This guidepost reflects a 'deference to legislative judgments concerning the appropriate sanctions for the conduct at issue,' and provides notice of possible sanctions to potential violators." Willow Inn, 399 F.3d at 237 (citation and internal citation omitted).

In Riley v. Kurtz, 1999 WL 801560 (6th Cir. 1999), the defendant issued the prisoner misconducts for failing to disperse and for incitement to riot and he spent fifteen days in disciplinary segregation as a result of the misconducts. Id. at *1. The jury found that the

12

defendant had retaliated against the prisoner in issuing the misconducts and that the defendant had also tampered with his mail. Riley, 1999 WL 801560 at *1-2. After vacating an award of $5,000.00 in compensatory damages and $5,000.00 in punitive damages on one of his retaliation claims, the court was left with the question of the propriety of a total of $15,000.00 in punitive damages against the backdrop of a $3.00 compensatory award. Id. at *7.

The court examined the Gore factors and noted that "[e]ven in a case where 'the economic injury is hard to detect,' a punitive damage award of $15,000.00 seems clearly disproportionate to the harm actually suffered by [plaintiff]." Id. at *8. In ordering a remittitur, court found:

> ... There is no allegation of physical abuse or excessive force, the disparity between nominal and punitive damages is quite large, and the official involved is a corrections officer. Furthermore, Riley suffered virtually no actual harm relating to the three claims still before us. His fifteen days of disciplinary segregation relate exclusively to the failure to disperse charge on which he was found guilty, and for which he therefore cannot recover.
>
> Taking all of the above factors into account, we conclude that the jury award "shocks the conscience." The maximum punitive damage award that we believe the facts of this case support is $1,000. We therefore order the award of punitive damages remitted to that amount. The resulting $1003 total award ($3 compensatory and $1,000 punitive) is in our opinion more consistent with the nominal harm Riley suffered in comparison with Kurtz's reprehensible conduct as found by the jury. ...

Riley, 1999 WL 801560 at *9.

Similarly, in Henderson v. Johnson, 2007 WL 781767 (C.D.Ill. 2007), the jury found that the defendant had deliberately filed a false disciplinary report against a prisoner in retaliation for his grievance against him which resulted in the prisoner spending seven days in segregated confinement. Id. at *4. The court reduced the compensatory award of $300.00 to $1.00 due to the PLRA's physical injury requirement. Id. at *6. Following the factors enunciated in Gore, the court found that the evidence did not support a finding that the defendant's conduct was so reprehensible as to justify $5,000 in punitive damages. Id. at *7. The court stated:

> In the court's view, allowing the $5,000 in punitives to stand

13

> would be a unwarranted windfall to the plaintiff and is not
> necessary to achieve the goals of punishing Johnson and deterring
> similar conduct in the future. The modest harm suffered by the
> plaintiff does not support an award of $5,000 in punitive damages.
> *See e.g., Smith v. Davis* 02-CV-233 (N.D.Ind.) (jury returned guilty
> verdict on claim that inmate was placed in administrative
> segregation for over *three years* in retaliation for grievance; $1,00
> of compensatory damages, $1,000 in punitive damages from each
> defendant who was primarily responsible). ...
>
> The Court believes that the award of punitive damages should be
> reduced to $500.00. The court believes this amount is substantial
> enough to recognize the importance of the plaintiff's constitutional
> right to petition for redress without retaliation, to punish Johnson,
> and to deter others from similar retaliation in the future.

Henderson, 2007 W. 781767 at *7-8. See also Mauer v. Patterson, 197 F.R.D. 244, 249-50 (S.D.N.Y. 2000) (reducing punitive damages award of $75,000.00 to $20,000.00 in a prisoner retaliation case).

In Tate v. Donovan, 2003 WL 21978141 (E.D.Pa. 2003), the court upheld a punitive damages award of $10,000.00 in a case where nominal damages of $1.00 had been awarded. However, the conduct in Tate was arguably more egregious than that which occurred here. Specifically, the jury heard evidence that: (1) several prison guards wrote false misconducts against the plaintiff; (2) the defendant instructed another inmate to wash the plaintiff's clothes in toilet cleanser, causing him to develop a rash; (3) the defendant frequently searched the plaintiff's cell and on one occasion knocked items off a shelf; (4) the defendant denied the plaintiff's request for toilet paper, telling him to "go file another lawsuit"; and (5) the defendant housed the plaintiff, a non-smoker, with cell mates who smoked. Id. at *1.

In the prison context, Plaintiff relies on Siggers-El v. Barlow, 433 F. Supp. 2d 811 (E.D.Mich. 2006). In Siggers-El, the prisoner-plaintiff alleged that the defendant retaliated against him in violation of his First Amendment rights by transferring him to another facility. As a result of the transfer, plaintiff lost his prison job, was prevented from seeing or paying for his attorney, was prevented him from seeing his emotionally disabled daughter and was required to endure a strip search and body cavity search. Siggers-El, 433 F. Supp. 2d at 815. The jury found

in favor of the plaintiff and awarded him $4,000.00 in economic damages, $15,000.00 in mental or emotional distress damages and $200,000.00 in punitive damages. Id. The court upheld the punitive damages award after examining the guideposts set forth in State Farm and Gore. Id. at 818.

We do not find Siggers-El persuasive. Although the retaliatory conduct was certainly more extreme in that case than here, in that, for example, it was known that the transfer would likely sever a fragile relationship with the prisoner's emotionally disabled daughter, the $200,000.00 punitive damages award was, in our view, excessive and well outside the "mainstream" of other prisoner retaliation cases.

After consideration of all the Gore factors, we conclude that the punitive damages award here is excessive and that a substantial reduction of the award is warranted. Consequently, the punitive damages award is reduced to $7,500.00.

### B. *Alleged errors in evidentiary rulings*

McConnell first argues that the Court erred in allowing Plaintiff to utilize the declaration of Michael Mahlmeister, a former employee of Albion, during his cross-examination of McConnell on the basis that the declaration was "hearsay" and was therefore improperly used to "impeach" McConnell. See Defendant's Brief pp. 11-12. We disagree. McConnell testified that in the course of his investigation of Plaintiff's grievance, he conducted an interview with Plaintiff on August 5, 2003, but did not issue the misconduct until August 26, 2003. See Trial Tr. Day 1 p. 141. McConnell attributed the three week delay to Officer Spurlock's being on vacation for two weeks and his own one week vacation. Trial Tr. Day 1 p. 142. Plaintiff subsequently introduced into evidence the daily rosters from Albion for the period from August 5, 2003 through August 26, 2003, which recorded staff assignments for the relevant time period. Trial Tr. Day 1 pp. 142-143; Plaintiff's Ex. 31. McConnell testified that his name did not appear on the log because he was a lieutenant assigned to the security office. Trial Tr. Day 1 pp. 143-144; Trial Tr. Day 2 p. 10.

Plaintiff then questioned McConnell concerning a declaration prepared by Mahlmeister in which he indicated that the reason McConnell's name did not appear on the officer's assignment log was because he was assigned to the security office. Trial Tr. Day 2 p. 11. McConnell agreed with the statements contained in the declaration. Trial Tr. Day 2 p. 11.

Defendant's counsel lodged a hearsay objection, and the following exchange occurred at sidebar:

• • •

> THE COURT: What is inconsistent with the declaration of Michael Mahlmeister and what this man testified to?
>
> MR. KERWIN: He testified yesterday that the only reason, the sole reason, he indicated several times that his name did not appear on the log because he was the tool sergeant.
>
> MS. WILSON: Tool lieutenant.
>
> MR. KERWIN: Tool lieutenant. This does not say so. I'm going further with this. This isn't where I'm stopping, it says the only reason his name does not appear on the sheet is because security personnel did not appear when covering another officer on the shift. This is inconsistent with his testimony –
>
> THE COURT: Look it. You submitted the affidavit. It was submitted. I think it's appropriate impeachment. **If in fact it is impeachment, it's not clear to me it is.**
>
> MS. WILSON: **I don't think it is either, I don't think it's inconsistent, he said the tool lieutenant is attached to the security office.** However, the DOC is not being sued. So this is not a sworn statement of a party. This is an out-of-court statement being admitted for the truth of the matter, it's hearsay.
>
> THE COURT: This statement is not going to go out with the jury. But I'm going to let you use this, if you can, to try to impeach this man. It's not going to be admitted as substantive evidence, it's going to be admitted as, if at all, as impeachment. **I'm hard pressed to see how it's impeachment, but you can ask him questions about it.** ...

• • •

See Trial Tr. Day 2 pp. 13-14 (emphasis added).

As previously discussed, McConnell agreed with Mahlmeister's averments in the

16

declaration. We see no hearsay problem here and even if there was, any error would be harmless.

McConnell next argues that the Court further erred in admitting into evidence Plaintiff's cumulative adjustment record ("CAR"). The CAR reflected two entries on July 23, 2003: Officer Griener's entry that Plaintiff was disrespectful and mouthy when ordered not to roam the dining hall and Officer Wernicki's entry stating Plaintiff had a poor attitude, problems following orders and was very smug and disrespectful towards staff. See Trial Tr. Day 1 p. 135; Plaintiff's Ex. 15. McConnell argues that the document was irrelevant because the document was not prepared by him. See Defendant's Brief p. 12.

The ultimate issue in this case was whether McConnell's actions in issuing Plaintiff a misconduct were motivated by retaliatory animus. In this regard, we find no error in the documents admission. McConnell testified that he considered the CAR as part of his investigation in concluding that Plaintiff had fabricated his allegations and, in fact, attached the CAR to his investigative report. In any event, even if its admission was erroneous, its admission was harmless under the circumstances.

    C.    ***Alleged errors in special interrogatories***

A prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must prove that: (1) the conduct of which he was engaged was constitutionally protected; (2) he suffered "adverse action" at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant. Carter v. McGrady, 292 F.3d 152, 158 (3rd Cir. 2002). "Once a prisoner has made his prima facie case, the burden shifts to the defendant to prove by a preponderance of the evidence that it 'would have made the same decision absent the protected conduct for reasons reasonably related to penological interest.'" Id. (quoting Rauser v. Horn, 241 F.3d 330, 334 (3rd Cir. 2001)).

Here, McConnell requested that the Court submit a special interrogatory asking the jury to determine, consistent with the above burden shifting paradigm, whether he would have issued

the misconduct, for reasons reasonably related to a legitimate penological interest, even if Plaintiff had not exercised his First Amendment rights. See Defendant's Proposed Verdict Slip [Doc. No. 109]. In rejecting McConnell's request, we observed:

> THE COURT: ... I looked at this issue about the prima facie case, and then if a prima facie case is made out, the defendant has an opportunity to come forward and say even in the absence of retaliatory animus, the same decision would have been made. I don't think that applies in this case. ... In other words, in some of these cases where that affirmative defense is available, such as this Carter case, 292 F.3d 152, the inmate was engaged in other conduct that was almost inarguably violative of other prison regulations, for which disciplinary action served a legitimate penological interest. Here, there is no separate penological interest, absent the alleged falsity of these charges. He isn't charged with starting a prison riot, he isn't charged with assaulting another inmate. He isn't charged with anything other than giving a false report. My point being, unless you can disabuse me of it, I think this is correct under the law, if he makes out a prima facie case, he wins his case. Because you don't have an independent penological interest separate and apart from the underlying reason why you sent him [to cell restriction]. ...

See Trial Tr. Day 1 pp. 210-211. Indeed, the following exchange suggests that defense counsel, at least at the time of trial, concurred:

> THE COURT: ... If the Defendant had not engaged in the protected activity of filing a grievance, let's put the lawsuit on the shelf for the time being. If he had not engaged in the protected activity in the filing of a grievance, and assuming only for the sake of discussion that there had been no lawsuit filed, either, it would make no sense, would it, for you to say that he would have been issued a misconduct in the absence of filing a grievance?
>
> MS. WILSON: That is correct.

See Trial Tr. Day 2 p. 110.

We find no error in our ruling that McConnell was not entitled to assert the defense that he would have taken the same action even in the absence of Plaintiff's protected activity. To reiterate, the case was defended **solely** on the basis that McConnell had a good faith belief, untainted by any retaliatory animus, that Plaintiff was lying concerning the alleged abuse. McConnell did not contend, and indeed, there was no evidence independently supporting the misconduct Plaintiff was given.

18

## IV. Conclusion

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RYAN KERWIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LT. WILLIAM MCCONELL, )<br>)<br>Defendant. ) | Civil Action No. 05-93 Erie |

**ORDER**

AND NOW, this 30th day of September, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED THAT:

1. Defendant's Motion to Amend or Alter Judgment [Doc. No. 121 ¶1] with respect to compensatory damages is DENIED;

2. Defendant's Motion to Amend or Alter Judgment [Doc. No. 121 ¶2] with respect to punitive damages is GRANTED, with the punitive damages award being reduced to $7,500.00, unless, within twenty-one (21) days from the date of this Order, Plaintiff informs the Court in writing that he refuses the remittitur and opts to proceed to a new trial as to the issue of punitive damages; and

3. Defendant's Motion for New Trial as to liability [Doc. No. 121 ¶¶3-4] is DENIED.

                                                                                            s/ Sean J. McLaughlin
                                                                                            United States District Judge

cm: All parties of record.